Good morning. Good morning, Your Honor. May it please the Court, my name is James Todd Bennett, appearing for the appellant. And I would like to reserve three minutes on rebuttal. Look at the clock and whatever time you say is yours. Yes, Your Honor. The first issue before the Court, and the fundamental issue in this case, is whether the jurisdiction of the U.S. District Court is precluded by the previous determination of this Court as to the aggravated felony issue in the previous petition for review. And I think there's two cases in the various circuits. There is no case in this circuit. The two cases that I've been able to find, and I think the Council's been able to find, is Galvan-Coate, which holds fundamentally that when a petition for review is dismissed on the jurisdictional issue of the aggravated felony, then it's res judicata and the District Court is precluded from re-entertaining the issue. The second case would be from the Fifth Circuit, Santos v. Reno, which at page 597, it's even, probably even a little more stringent in its standards, where if the grounds could have been raised in the petition for review, then the District Court's precluded from revisiting those issues as well. I think the language lends itself to that. But it goes on further to say that if the issue couldn't have been fairly raised in the petition for review, then habeas continues to lie. Now, as to Galvan-Coate, I believe there's two exceptions that come up. First, under Galvan-Coate decision itself, the Court is not bound by those issues. Excuse me. The District Court would not be bound by those issues which were not relative to its jurisdictional finding. In other words, if you have further 2241C3 issues, detention in violation of a treaty law or statute or constitution, that issue would survive for habeas review. The second issue that comes up, the exception would come under the Clifton case cited by a reply brief and also cited by the opposing party in their brief, which basically says that an intervening change in the law would allow a revisitation of the aggravated felony issue. I believe that would be the case in this case. The change in the law that I would specifically refer to would be the decision in Corona-Sanchez, which essentially, while the narrow holding of Corona-Sanchez is that the enhancement element in a sentence under the laws of the State of California cannot be used to determine the sentence for the aggravated felony, that's the narrow holding. But I think in general terms, Corona-Sanchez says we must look at the state sentencing structure. I'm confused, and I apologize. You have an issue as to whether or not your client had been convicted of an aggravated felony, right? Yes. And what do you say the district court here did wrong with respect to that issue? Yes. The district court dismissed the petition for habeas corpus on the grounds that the finding was res judicata based on the previous dismissal for jurisdictional grounds before this Court. Well, what's the matter with that? It appears to me that the aggravated felony issue necessarily had to have been decided before, and that's the end of the game. You're trying to bring up something that's already been adjudicated, said the district court. It was an aggravated felony, so we're not going to let you bring it up again. I think the issue, the issue, as I see it, is with under Clifton, you're between two judgments. You've got a second judgment in the district court dismissing the petition. It's not final. There's an appeal, and there's been the intervening decision in Corona-Sanchez. My point is that with Corona-Sanchez, I think we're being directed back to look at state law sentencing provisions to determine if this is a sentence. And the specific language under the definitional statute would be. You know, I just don't follow it at all. I mean, this was decided, and that's what the district court concluded. Yes, and that's understood, Your Honor, and that's a given in this case. Right. But the argument is that given the subsequent decision in Corona-Sanchez between the two judgments, that re-raises the issue of whether or not this is, in fact, an aggravated felony. How? How? You say that raises. How? It's a question of how the state sentencing law provisions affect the language. It sounds like you're trying to reopen the determination already that it was an aggravated felony on the basis of new legal developments. Exactly. But that's closed. Was there an appeal or a habeas from the earlier decision that the district court believed was conclusive and final and ended the issue? That's understood, Your Honor. However. The answer is no. The answer is no because so that's it. It's over. And what am I missing? A change in the law. Well, so don't you have to go back and reopen the earlier case with some kind of writ of air corum fobis or something like that? I mean, that case is over. That law changes all the time. Your argument is that Clifton lets you go back. I'm sorry, Your Honor? Your argument is that Clifton lets you go back. Our case in Clifton lets you go back. That's your argument. It's a procedural problem. And if you have an intervening change of the law and the mandate's already issued in this court, how do we reopen? We can't recall the mandate. If it comes up on appeal and there has been an intervening change of the law. Sometimes you're just stuck, you know. Sometimes it's over. Counsel, if we were to accept your argument, as I looked at this record, it seemed that the individual was sentenced to a year without any of these enhancements for prior things so that he would be an aggravated felony in any event. Am I wrong? On a narrow reading of, well, the actual issue in front of the Corona-Sanchez court was what is the effect of the enhancement on this petty theft conviction? And the holding of the majority was you can't use that to count towards an aggravated felony. My reading of Corona-Sanchez is generally it's telling us we've got to look at the state sentencing scheme. Well, but I think what Judge Fletcher's asking is let's have a look at the sentencing scheme. Your guy got a year. It turns out he already served part of the sentence in pretrial detention, so he got time for time he's already served. He got a credit for time he's already served. There wasn't in any sense a reduction of the one-year sentence. He did serve those 50 or 60 days. He didn't get some better, you know. So I guess I have the same problem that I understand Judge Fletcher to have. How does any of this help you anyway? If I could briefly explain the pre-sentencing credit scheme and just very briefly. Take your time. There's two statutes. There's 2900.5 and there's 4019 under the laws of the state of California. 4019 has two credit schemes, one for work credits and one for what we'd so-call good time credits. Those apply to two instances. It applies to time served before sentencing, and they also apply to time served after sentencing. It's settled law in this circuit under Byrd, so all the way back to 1961, post-sentencing credits can't be used to reduce a sentence for immigration purposes. It doesn't change the sentence imposed by the court. In this case, Contreras goes in front of the court. He's earned 50 days of credits. Those aren't 50 days sitting in a hoose gal waiting for his trial or his plea. Those include the six-to-one ratio. In other words, every six days he's sitting there, he gets one extra day credits. Those vest. So in other words, the amount of time actually spent is not simply a deduction of time that he's been sitting there. He's also earning credits that are vested at the time of the sentence, and under 1101A48B, the language is the sentence ordered by the court. The sentence ordered by the court includes those credits at that point in time. It's not something in the future. It's not something he can be stripped of. It's something he already possesses, and it's not just simply a counting of days. It's, in addition to that, good time and work credits. In addition to that, he gets credits under the 2900.5 statute. Okay. I noticed my time. You've got 20 seconds. You want to save it for a bottle? I'm up. You still have 20 seconds for a bottle. Okay. We'll hear from the government. May it please the court. My name is Shelley Good, and I represent the respondents in this matter. This case arises from Mr. Contreras-Castillas' petition for habeas corpus in the district court to answer the question previously addressed by this court, that is whether his conviction for corporal injury to a spouse or a cohabitant is an aggravated felony. The district court correctly determined that this court's dismissal of Mr. Contreras-Castillas' direct appeal from the removal order of the Board of Immigration Appeals, which was premised on the fact that Mr. Contreras-Castillas was convicted of an aggravated felony, and in which Mr. Contreras-Castillas made the exact same arguments he made to the district court with binding on the district court. When you say binding, what exactly does that mean? That's not a legal doctrine. Well, it was res judicata. Well, but that clearly is wrong, right? Under our opinion in Caledon v. USDC, Cali 4, we held that res judicata does not apply to habeas proceedings. So insofar as the district court relied on res judicata, it's wrong, right? Well, but the district court didn't. Well, that's why I asked you. You can use the word binding. You're the one that stood there and tried to defend the district court's ruling on res judicata grounds. Are you now taking that back? No. You're familiar with Cali, right? Wait, I'm sorry. You're familiar with Cali 4? Actually, I'm not. It's an embarrassing opinion. United States, Caledon v. USDC, Cali 4, we held res judicata does not apply on habeas. You can look it up. It really says that. What do you do with that? We still argue that the district court was correct in its determination that this court's dismissal of the petition for review is binding upon the district court. We need a legal pigeonhole. Pardon? We need a legal pigeonhole. I think the word you're grouping for is abuse of the writ. Trust me, that's what you're looking for. Because that's what Cali says. That it's abuse of the writ. There we go. Res judicata. Well, given that we are now no longer in res judicata land and we are in abuse of the writ land, assuming that to be the case, does abuse of the writ work the same as res judicata in terms of intervening decisions? I am pretty sure it doesn't. Res judicata, you know, once it's in its end and you can have all sorts of intervening stuff, nothing moves it. Abuse of the writ is really a different doctrine. It's much more flexible. It is much more equity-based. And if you have a sea change in the law intervening, you might well allow filing of the writ even though you have a prior adjudication. Right. I believe even if that, assuming that to be the case, it doesn't matter in this instance because there was not an intervening change of law that affects Mr. Country, Escostia's conviction or renders it non-enactable. What about Corona Sanchez? Pardon? What about Corona Sanchez? Corona Sanchez. Yes, Corona Sanchez. In that decision, this Court found that you look to the sentence available for the crime itself and not the sentence enhancement, the recidivist sentence enhancement. I don't think that affects Mr. Country, Escostia's sentence. Under this Court's decision in the United States versus Echeveria-Escobar, a term of imprisonment is the time assessed or imposed as opposed to time actually served. And this Court, in dismissing the petition for review, cited that case in its dismissal. So just as sentence enhancements shouldn't be used to increase the time available for a conviction, the pre-sentencing credit should also not be used to decrease the sentence for purposes of the sentence available. Even if the pre-sentence credits are not for actual time served but they are enhancements, as the opposing counsel tells us, for, I don't know, good time credits or work. I think that under this Court, it's directly controlled by United States versus Echeveria-Escobar in that what is imposed is what we look to. And essentially the 1st, 2nd, 3rd, 5th, 8th, 10th, and 11th circuits have held that whether a defendant's sentence is suspended is immaterial when determining whether a suspended sentence meets the aggravated felony requirements. In addition, I also... So you see, you view these good time credits or work credits as essentially being... Yes, essentially... You don't know what I'm going to say. Pardon? You don't know what I'm going to say. I'm sorry. The same as a pumpkin. You agree with that? No. You view them as being like a suspended sentence. Yes. You get a year, but because of your history, whatever, we're going to suspend part of the time served. Correct. Okay. I also wanted to point out that Mr. Contreras-Castillas was also charged as being removable under a separate ground of removability at INA Section 237A2, large E, small I, which is a charge of removability based on a crime of domestic violence, and that's not an aggravated felony. So in essence, even assuming for some reason that his crime was no longer an aggravated felony, he's still removable on a separate and independent ground, which would make a difference. If there are no other questions. Okay. Thank you. Want a minute for rebuttal? Just briefly, Your Honor. Okay. I'd note that the Alberto Gonzalez case, Construing 101A43F, says it's the sentence imposed. I think it necessarily has to be read in conjunction with the 1101A48B, which is the definitional provision for what is a sentence. And that is the sentence ordered by the court. I'd like to reiterate that point. The second point I'd like to make, Your Honor, in closing, there is an error in the record that I've discussed with counsel as far as the transcript attached to one of the exhibits. We would like to correct that by stipulation and submit it to the court, and we will be doing that within the week. Okay. Thank you. Thank you, Your Honor. The case is arguable. It stands submitted. I gather counsel is not present for Carr's day versus Ignacio. Okay. We'll hear arguments on that case next. Good morning. My name is John Lambros on behalf of Mr. Cusdy, and if I could, I'd like to reserve about a minute for rebuttal. I think the entire appeal starts and ends with what Judge McKibben said on April 28, 1997, when he incorporated by reference his March 3, 1997 order, assuring us, assuring Mr. Cusdy, and we were counsel for Mr. Cusdy at the time, that a voluntary dismissal of the instant petition would not prejudice in any way Mr. Cusdy's ability to seek further habeas corpus relief through a subsequent petition. End of story. Promise made. Mr. Cusdy filed his state post-conviction petition. And support of that, you cite what? I cite Judge McKibben's order. That's at excerpts of record, page 49. Any authority from our court? I'm sorry? Any authority from our court? Yeah, I think starting with the Kelly 4 and ending with the most recent case last week, I believe, Smith v. Rattell. Okay. You want to save the rest of your time for rebuttal?  Thank you. Okay. Mr. Neidert, how are you? Please, the Court, my name is David Neidert. I'm a Deputy Attorney General for the State of Nevada. You have an uphill battle. I would agree with that, Your Honor. And I would agree that Mr. Lambros identified the place where there is perhaps the problem, as to whether, in fact, and that is on page 49. I would say he probably identified more than perhaps a problem. I think he identified a big problem. We have not only a statement from the United States District Judge telling, giving the defendant what turns out to have been a petitioner, I guess. That's what I was looking for. He said petitioner. What I'm sure was good advice at the time, but turns out to have been wrong. But we have a case within the last week from our own court saying that kind of advice amounts to equitable. I have been around Smith v. Rattell. Right. And the only, and I'll be frank, Your Honors, when I read Smith a week ago, I realized I had an uphill battle walking in here today. The only. Well, you had an uphill battle before that. But even more uphill battle, even after that, Your Honor. Now we're talking about rappelling. It seems to me that Smith said the battle and the war were over. Yeah, you can't. The only distinction that I can make, and with all candor after reading Smith very carefully, is that in Smith the district court sua sponte dismissed on exhaustion grounds without giving the opportunity to abandon the unexhausted claims and proceed on an unmixed petition. That's the only distinction I really see, Your Honors. Is that a distinction sufficient enough to say Smith v. Rattell and the principles that are established therein don't apply here? Well, I would say that because the district judge in Smith happens to sua sponte without giving the opportunity, and Judge McKibben did in Mr. Cosby's first case, that's the distinction that I can draw. But to be very honest, I don't know, looking at the way this court has dealt with the issue of equitable tolling, I don't know if I can stand up here with a straight face and say that Smith really controls, and as Judge Kaczynski said, I'm basically having to do some heavy-duty rock climbing right now. And Judge Beezer would agree in this case. He said on these facts in Smith, well, these are, you know, once the federal judge says that, I don't know. I don't want to concede the case, but I do agree that based on what Judge McKibben told Mr. Cosby and his counsel that this is. Well, I think that's fair. Maybe you want to watch Rattell and see whether there's a petition for a hearing. I mean, the case is not final. It's only a week old, and anything could happen. And I think that's probably my best response is that perhaps Smith will not be finalized. Maybe it will be reheard. Maybe this court will hear it en banc. Maybe the Supreme Court will hear it. Maybe some miracle will happen, but I believe at this point Smith controls. I can't be sure we will not do anything inconsistent. I mean, if something happens to Rattell, we certainly will not. But I do believe that the starting point and the end point of this entire discussion is what Judge McKibben said, which is found on that report. You know, we show on our calendar that it was Judge Reed, but it was not Judge Reed? Well, Judge Reed issued the order dismissing. And I think Judge Reed's order was correct, but neither Judge Reed nor Judge McKibben had the precision of knowing what this court was going to be deciding in the realm of equitable tolling. Judge McKibben said this in a 1996 federal habeas petition, which was dismissed voluntarily by Mr. Cusby, and then when it came back, it was randomly reassigned to Judge Reed. And that's how it's Judge Reed's name on the letter on the case name, but we're talking about a decision that was written by Judge McKibben. Okay. Thank you. You have lots of time for a bottle if you want to use it. I think that I don't want to use it anymore. Thank you so much. Judge Fletcher said yesterday, why shoot a dead duck twice? Okay. Case as I understand submitted. We'll next hear Twin Cities Fire Insurance versus Emin. Good morning. I reserve a couple of minutes for rebuttal, if I may. We'll just keep you on that clock. Okay. Jim Wilkins appearing on behalf of appellants Wayne and Julia Allen. May it please the court. The issue before this court primarily deals with whether or not the district court erred in granting summary judgment in favor of the insurers by fire. We're finding, as a matter of law, that there is no potential for advertising injury under a comprehensive general liability policy or a commercial umbrella policy. And advertising injury coverage, as defined in the policy, really three elements that we have to be concerned with here. The first element would be, is it a covered offense? The second element would be, does it involve the insured's advertising activities? And the third would be, did it occur in the course of it, the insured's advertising activities? In this case, what Judge Ishii found was, as a matter of law, because the judgment rendered against Wanda Weave, the insured, was based on an implied in contract theory that it could not involve a misappropriation of advertising idea. Basically, what Judge Ishii concluded was, because there's an implied in fact contract, there must have been a meeting of the minds, and therefore there can be no wrongful taking, as LaBasse found in LaBasse v. Hartford, that that term, misappropriation of advertising idea, the offense, which is at issue in this case, that there couldn't be a wrongful taking. Our contention are multifold, but first, simply because the jury found on an implied in fact contract does not necessarily preclude a finding that the taking or use, because LaBasse said both constitute misappropriation, was not wrongful. And basically what Ishii has done is he's disregarded kind of the theory and holding of the California Supreme Court in the Vandenberg case. The Vandenberg case overruled probably 25 to 30 years of appellate court decisions which had held that the insuring language of a general liability policy, which limited coverage to damages for which an insured becomes legally liable, that that phrase in and of itself meant that a general liability policy could not cover breach of contract. And what the Supreme Court did is say that language is not susceptible to that interpretation. That's not a reasonable interpretation. What Ishii has done is he has said simply because the offense is called misappropriation of advertising idea and that there was a finding of a contract cause of action liability, that it must be tort, otherwise it's not wrongful. LaBasse doesn't say that. What LaBasse says is that term, misappropriation of advertising idea, is susceptible to more than one interpretation. It's ambiguous. And that's what that court found. And it says it doesn't matter what the cause of action is upon which liability is based. It may be ambiguous of an issue, but once the parties have a contract, it's a little troublesome to say that when you don't pay on a contract, then it becomes theft. It's sort of like saying I don't make the payments on my car, and therefore the lender can say, oh, well, because you haven't made the contract, you've basically stolen the car. And once there was a finding made here that there was a contract. But it was an implied in fact contract. And the California Supreme Court in the cases that we've discussed in our briefs. Implied in fact contract is a contract. It is, but it doesn't necessarily involve a meeting of the minds. You can have an implied in fact contract even though one party to the contract never intended to comply with the duties under that contract that's found. You basically take the parties and you look at them and say, what is the objective evidence established? And if objectively we can say that both parties had a contract, regardless of the undisclosed intention of one party never to perform, never to honor, that we can stand here and say that's a contract whether you intended to do it or not, because your actions establish it. So the wrongfulness is if there's evidence that shows that the undisclosed intention of one of the parties was never to perform the contract, why isn't that wrongful? And in this case we submitted evidence to Judge Ishii that established that, in fact, that was the evidence that was presented at trial, was that the party to the contract never intended to perform the contract. Let's say it is wrongful. Why aren't you still limited to contract damages? I mean, you could have a non-implied contract. You could have an express contract. You know, you and I signed a contract and I secretly never planned to. What Abbas teaches us is it doesn't matter what the theory of damages are and it doesn't matter what the theory of liability is. We used to have the Siemens tort, right, in California, but that no longer exists where you could enter an express contract and then if you didn't intend to, you sort of intended to deny it, that could be a tort, and the California Supreme Court has done away with that. Correct. So we experimented with that for a while and said, no, this is too difficult. But with all due respect, the issue of whether the damages are contract damages or tort damages is irrelevant for purposes of what is required under the insuring agreement of the policy. It does not say that it's got to be a misappropriation by something other than an implied in contract theory, and in fact it does just the opposite because there's an exclusion in the policy where the insurers have said there's no coverage if it's a misappropriation based on a breach of contract except an implied in fact. Now, I don't say that that creates coverage. What I say is it evidences the intent of the insurance company that absent that exclusion, the insuring agreement clearly does provide coverage for a breach of contract. So what they do is they say no coverage for breach of contract unless it's an implied contract. So a reasonable interpretation of that is that it doesn't matter whether the damages are tort or contract. That's not the issue. The issue is was the taking wrongful? Whatever recovery might be found down the line is separate and distinct from the first issue, is it a misappropriation? And under LABAS, as long as it's wrongful, it is, and it doesn't matter what the theory of liability was and it doesn't matter what type of damages were awarded because there's nothing in the policy that would preclude it. Except it's a little troublesome to be having insurance for breach of contract, and I don't perform and bam, you insurance normally is for tort-type damages, for the unexpected, the unforeseen, the accidental, and I don't feel like performing my contract doesn't strike me as a little insurable. It's not at all unusual to have insurance protection for a contractual relationship. It happens all the time. Surety bonds, performance bonds, that's a type of insurance that protects somebody for failing to comply with their contract to perform. And Vandenberg makes clear the notion, and I can understand the court's perspective, because the notion for 25 to 30 years based on appellate authority in California was breach of contracts not covered under general liability policy. And Vandenberg came out and said that's not the law. It said that's not a reasonable interpretation of a general liability policy. And so what Vandenberg tells insurers is unless you've got clear and unambiguous language that expressly excludes coverage for breach of contract, you cover it. And what the insurers did here was they did have an exclusion, which said no coverage for misappropriation from a breach of contract, but then very clearly said except for a contract that's implied. So even though someone might say, well, gee, it kind of rubs wrong the idea of what an insurance, the California Supreme Court has said that isn't wrong. You enter into a contract, it says what it says, and if it doesn't clearly preclude it, it's covered. More importantly, the idea that it only covers fortuitous events or accidental events, just look at the other types of benefits that are covered. When you think of property damage, bodily injury, the notion you expressed generally recognized. But when you look at the other types of coverages under personal injury and advertising injury, the insurance company makes very clear that it's insuring something, agreeing to insure something far beyond typical fortuitous accidental events. Defamation. Defamation is clearly covered under the definition of personal injury. Disparagement of one's goods, services, or products. Disparagement is covered. It's an expressly defined covered offense under the policy. There are numerous offenses that are in the context of traditional tort theories would be defined as an intentional tort, but still covered. And so the notion that it's not an accident really doesn't get there. What we have to focus ourselves on is that the insurance company is going to be bound by the language of its policy. And if it writes its policy in such a way that it can cover this instance, even though that may rub wrong the notion of what you might basically have as to what insurance is for, they're bound by that determination. Now what we're saying then, you can insure against your own bad faith. You absolutely can if you have that type of insurance, and particularly in this case because this policy was written in South Carolina. One of the issues that Justice Ishii did was he kind of as a throwaway issue said, even if we could find some wrongful conduct here under California Insurance Code Section 533, if we're right that it was a basically inducement to take the misappropriation, to take the advertising idea by fraud, that that would be precluded. In this case, because One to Weave is a South Carolina company, bought this policy in South Carolina, the policy has numerous South Carolina specific endorsements. You have to determine which law applies. And under California law, the way that works is you apply the governmental interest test, and the first analysis is, is there a conflict? Here there's no dispute. In South Carolina, they allow for insurance for intentional acts, for punitive damages, willful conduct. It can be covered. Absent a specific clear exclusion, it's covered. Whereas in California, Insurance Code 533 would prohibit that. So we have a clear conflict. Now we have to evaluate whether or not whose interest is going to be more imperative. And the case law that we've cited makes it clear that in this context, even California recognizes that the state where a contract is entered into, that state has a compelling interest to see that its laws are important. And when you recognize that One to Weave enters into this contract with the insurers in South Carolina, who should know that South Carolina allows for indemnity coverage for willful acts, and have for over 30 years, that they should know that this party purchasing that contract has that expectation and is entitled to enter into that contract freely and have it enforced. How does that square with this? The parties either agree that California law applies or submit that California law and South Carolina law do not conflict on the relevant points of law, with one exception on a legal point the court does not reach. Therefore, the court will apply California law. It's true with respect to the interpretation of the policy of the issues of the advertising interest. Is it a misappropriation? Advertising activities occur in the course of. That was California law would apply because there is no conflict. The one issue that's been argued is, even if the court were to find this because of fraud, 533 would apply. And on Amico's motion, the court did reference that 533 would apply. That's the issue where there's a conflict. And the parties didn't stipulate as to that issue that California law would apply. In fact, Amico never even raised that issue in its motion for summary judgment. So we file our opposition to the motion for summary judgment, and Judge Easey says, as kind of another argument, that in addition, I find 533 applies. So we were never given the opportunity to even address that issue as it was teed up. Let me ask this. In the pleadings, what did the parties plead as to what was the applicable law? As to the interpretation of advertising and everything but the intentional act issue? California law. Because there is no conflict. And so was this pled? I'm sorry? Was this pled in the pleadings and the complaint and the answer? You mean like the debt relief complaint? Well, there's a general proposition. If you're in the foreign state and you don't say anything, foreign law is going to apply. There was never any pleading on behalf of Julie and Wayne Annett that they stipulated that California would apply for all issues. In fact, when we filed, this came on cross-motion for summary judgment. And when we filed our summary judgment, we anticipated this argument and briefed that issue, saying, with the exception of, as to Twin City, with the exception of everything but the intentional act issue, California law applies. But when you get to the intentional act issue, it's South Carolina. And we made that clear from the get-go. In your pleadings? I'm sorry? In your pleadings? There's nothing in the pleading where we stipulated that California law applied for all issues. Well, it would apply for all issues if nobody said anything else. I don't think it – if you haven't stipulated to what the law is and say that it is California, I'm not aware of authority that says then automatically forever every issue is determined by the foreign state. Well, you might go take a little look at the law on that point. But I think in the joint status conference statement, I think we did raise that as an issue. Your Honor, I don't have that before me, but I think that was an issue that was raised as to there is a potential issue as to which state law applies. I'm pretty confident of that. And if the court would like, I'd submit a supplemental letter of brief to confirm if that's the case. Let me ask. In the underlying case, it's on appeal. Is that right? And it stayed? Actually, that appeal has been dismissed. It's been dismissed? Correct. So it's gone? Yes. So you're stuck with whatever happened? Whatever we decide in the coverage case. And it shouldn't matter because basically what Judge Ishii has found in essence and what's essentially being argued is that there was an adjudication of the coverage issue in the underlying case when, in fact, it wasn't. The parties didn't litigate whether the liability that was found against Wanda Weave was covered under the policy. That was not an issue addressed in the underlying case. But what Judge Ishii finds is that because the jury was instructed the way that it was and it found the way that it did on the supply contract, by definition it means it can't be covered. Well, he said, because unlike the use of the trademark in LaBasse, the jury concluded that Wanda Weave's use or taking was pursuant to an implied-in-fact agreement, which means that Wanda Weave had the contractual right to use the marketing plan coupled with an obligation to pay. The fact that Wanda Weave breached the implied-in-fact agreement by not paying does not change the character of its earlier lawful taking into a wrongful taking. Except the jury instruction number 28 says that the jury could have found that the implied-in-contract theory, that Wanda Weave was liable for implied-in-fact contract because it knew or should have known that they were entering into this contract. And so the jury did not find that there was a meeting of the minds. Judge Ishii's conclusion is based on the assumption that there was, in fact, a meeting of the minds. And we cited the Desney case, a California Supreme Court case, that makes clear that an implied-in-fact contract theory does not necessarily require a meeting of the minds. And so back to the notion of if, in fact, Wanda Weave is because of the objective evidence of the contract, but, in fact, the undisclosed intention was, at the time of the taking, never to intend to honor it, to induce my clients to turn over their advertising idea on fraud. So your whole case rises or falls on the language in the instruction should have known? If that language was not in there, you wouldn't have a case? No, but what I'm saying is that his input... What if the finding had been there was a contract, there was a meeting of the minds, the parties agreed, and, therefore, this was being used with the consent and under that understanding of the... Then I would say even under Le Bon... Even under that, you would think you'd have a misappropriation? Yes. Appropriation? Yes, because they took it without the intent to ever pay. And just because you say there's... that they did enter into a contract, that doesn't necessarily... How do you know they took it with the intent to never pay if there was a meeting of minds that they would pay? That's what a contract is all about. Sure. They entered into a contract... I should have known in DESNY. That's the way I hear you. Because you can always have multiple theories of liability. You can be liable for fraud and breach of contract. You can be liable... I mean, what theory do you... Breach of contract can be misappropriation. It could be. It's not necessarily... it doesn't necessarily preclude it. Under what circumstances could it be? Under the circumstances where the party entered into it with never having the intent to perform it. You could sign a contract saying, I'm going to pay for something and never have the intent to do it, take whatever the product is, and never pay for it. You'd be liable for breach of contract, but you could also be liable for fraud. There are multiple theories for liability under the same fact pattern. And so just because you're liable on a breach of contract doesn't necessarily mean you couldn't be liable for fraud. So if we agree with you, what happens in this case? In this case, then, well, there's multiple... One, you could just reverse the summary judgment. We go back down, and the judge could evaluate what the evidence that we submitted, which wasn't really considered because he focused just on the liability. Or two, you could look at the whole record, and you can say that we did submit undisputed evidence of what the true intention of One to Weave was. And then, in fact, their summary judgment should be denied and ours is granted. And, in fact, the judgment is covered under the policies. I have a... You have minus three seconds for a vote. Thank you, Your Honor. We'll hear from the other side. Good morning, Your Honors. I'm Bruce Celebrezze for American Motorist Insurance Company. I'm not sure if Mr. Wilkins misspoke or not, but what he said at the beginning was that we're here to talk about whether there is a potential for coverage under the advertising injury coverage, and that is absolutely wrong. This is a duty-to-indemnify question. The question is, is there or is there not coverage under these insurance policies for the judgment in the underlying case on the theory of breach of implied in fact contract? And in order to find whether there is or isn't coverage, the judgment creditor here has to show that all three prongs of the advertising injury test are met, and that none of the exclusions are applicable. I believe that this case does begin and end with the judgment in the underlying case. The judgment. The point that got my attention, and I was trying to telegraph to you, was that the instructions, maybe they don't, but I've been told the instructions say should have known. So this might have been an implied in fact contract where there really wasn't the kind of meeting of the minds and agreement that you ordinarily would have, but it's a situation where somebody should have known. And DESNY suggests that we're simply going to stick you with a contract, even though you were sneaking around and there wasn't really one completely formed. What about that? Well, I'm not sure that that is wrong, Your Honor, but I don't think that has anything to do with whether there is or isn't coverage here. We need to look at what this case procedurally was very interesting because. But it sounds to me that if that's true, it should have known, and they were up to no good, then it might have been a misappropriation. It clearly could not have been a misappropriation under the cases that talk about advertising injury coverage because what we have is everyone admits that at the beginning there was an agreement. The Enns admit this, that they turned over this marketing plan to One to Weave at this Scottsdale conference in November of 93, that One to Weave paid for it for several months and then stopped in January of 94. And what the argument is is that then this contract, this agreement, be it an oral agreement, be it implied in fact, be it whatever it was, somehow metamorphosed into a wrongful taking. As George Kosinski says, one day I'm a party with a contract, the next day I'm a thief. That is the argument here. And there is no case, they cannot cite any case, nor have we found any, to suggest any such thing in the context of the offense of misappropriation of advertising ideas under the advertising injury coverage. If you look at the cases, both from this circuit, from California. What do you make of Vandenberg? I think Vandenberg, again, I don't disagree with Vandenberg, obviously, it's the Supreme Court. You can disagree all you want. But what it said is... I mean, I think I disagree with it, but what difference does that make? I guess none of us in this room get a vote on that court, Your Honor. That's right, so there we go. What Vandenberg said was that the language in the insuring agreement, legally obligated to pay as damages, could be broad enough to include an underlying judgment based on a breach of contract theory. And what the Supreme Court said is, what you've got to do is look at the nature of the risk and the nature of the damages that were adjudicated. And we say by doing that, the nature of the risk here, the underlying case... I have to take a step back, Your Honor. The underlying case, shortly after it was filed, there was a bankruptcy, so it was stayed. When did we file bankruptcy? There was a relief from the bankruptcy court, allowing the case then to proceed as is typical, but only against insurance proceeds. So contrary to most plaintiffs, the enons knew at the very beginning of their case that their only hope of ever getting any money here would be that if they got a judgment, if they could, that would be covered by insurance. So they set about doing that by filing an amended complaint with 11 causes of action, including things such as misappropriation of advertising ideas, misappropriation of trade secrets, unfair competition, trademark infringement, all sorts of things that sort of have the buzzwords of advertising injury coverage. And what happened? They lost on all of those counts. They either lost summary judgment or judgment on the pleadings. And so they went to trial on that which they could prevail on, the breach of implied contract. In their briefing, they complained bitterly about one of which was conversion, except that the judge instructed the jury that if they found a breach of implied contract, they could not find conversion. And if that was an error on the part of Judge Ishii, this is not the appeal to deal with that error. That was the appeal from the underlying case, which they have now acknowledged that they dismissed for reasons unknown to us. So they want this court to speculate that if the jury had been allowed to decide whether there was or wasn't a conversion, that they would have decided that there was. Your honors cannot do that any more than I can do it. The law in California for collecting on a judgment. Well, it still gets us back to the should have, you know, part of the destruction. And the fact that they find that the jury found an implied in fact contract, not an express contract. But there's no question the jury only found an implied in fact contract. And it's also true that. But given the way it was instructed, it could have found an implied in fact contract even though there was no meeting of the minds. That is possible. But to go from there to speculate that there was no intent to perform, again, I don't think it matters because of what the term misappropriation of advertising ideas means in the context of the cases discussing advertising injury coverage. It is a situation where there is a competitor stealing trade secrets, stealing customer lists, stealing trade dress. We find no case, none of us have found any case, where the courts find that there's a misappropriation of advertising ideas, where you have two parties who are having a relationship with one another and then their business relationship sours, whether it should have known or not. What I hear the other side saying is they're ready to prove that this thing was a fraud from the outset. For example, I go down to U-Haul and my intention is to steal a U-Haul truck. And I sign the contract and I do all that kind of stuff. I hand the contract in. It's a sham. And I take the truck. It's, you know, I've stolen the truck. I haven't just breached the contract. The contract was simply a way of getting it. And they seem to be saying here, that's what, this was, the contract was really a sham. They had no intention to pay for it in the first place. They just used that to get their hands on this kind of stuff and then they didn't pay. And, therefore, it was a misappropriation. I just, I don't understand. I don't understand. I do believe that's what they're saying. They had no intention to pay for this. The contract was simply the equivalent of a loaded gun to get their hands on this stuff. Well, that is his speculation because, obviously, he did not prove that in the underlying case, which is the very case he's trying to collect on here. He brings a judgment to this court for $2,097,000 and says, please tell the insurance companies to pay it. He has to be bound by what he, not he, but what his clients proved or did not prove in the underlying case. So their state of mind is not relevant, I don't believe, to the coverage issue. But it's really no different to me then. Any time there is ever a breach of contract, anybody could come into this court and say, well, let me try to prove, even though I didn't prove it in the case I'm trying to collect on, let me go back and try to prove it in a coverage case that they never meant to perform because that might convert. It would be tougher if the case, there was a express contract, and there was just simply a breach of contract on instruction, if there was a meeting of the minds, a normal breach of contract instruction. But here you have a case where the jury finds implied and fair contract under instruction that does allow them to, at least under one theory of facts, to say, you may have had in mind that you're going to take this and not pay. That may have been your subjective intention, but we're going to hold you to a contract anyway. I understand that, Your Honor. That is one possible way in which the jury in that case could have found, could have reached that verdict. Is that not possible given the instructions and given the evidence in that case? That is possible, Your Honor, but it doesn't affect the coverage because they cannot. Why doesn't it? If that's one possible basis for the verdict in that case, then isn't it precisely the kind of situation that Judge Trump was talking about? They signed the contract. They never intend, you know, they don't view it as a contract. They view it as a way to extract these goodies from the other side. And then when they get to court, the jury says, well, you may not have intended it. It may not have been a meeting of the minds, but we're going to treat it as a contract anyway because you should have felt bound. I think that that would all be fine if we were just talking about abstractions, but we are talking about a case that was actually tried. They had 11 causes of action, including misappropriation on various counts, all that were thrown out as a matter of law prior to trial because they were not able to prove their case against Wunderweef. So this is all my point. It is all speculation as to what might have happened. We have to look at what did happen. If I could just move on, Your Honor, to the other. Well, no, no. You're going to tell me what did happen. What I see that did happen is that they entered a verdict on an implied-in-fact contract where the possibility is that it could have been a jury finding of fraud. I mean, you want to tell me that that's not what in fact happened. You've got to go to the evidence. What was it about that case to preclude that possibility? I didn't mean to say, Your Honor, that that might not have been what was in the jury's mind. What I said was. Well, if that might have been in the jury's mind and that is not precluded somehow by the facts or by the way the case was tried or something else, if that might have been in the jury's mind, why is that within the coverage of the policy? Because, Your Honor, there is no case that interprets an implied-in-fact contract finding, even if you assume that it was based on some fraudulent intent on the part of one of the parties, that there is no case that equates that to misappropriation of advertising ideas. The point I was trying to make is that is particularly true in this case where various misappropriation allegations were made and where proof was not made. We have to look at what the courts are interpreting the term misappropriation of advertising ideas to mean, and none of them apply it in a context where you don't have competitors, where you have. Well, just take Judge Tots' example, just exactly as he described it. He goes down to U-Haul, wants to steal a trailer, and so fills out a bunch of paperwork, never intending to be a contract, never intending to live up to it, gives a phony credit card as security, and his only purpose is to get possession of that trailer and drive it off. I'm not quite sure. You say, you know, there's no case that covers it, but it seems to be pretty obvious that that is something that, if you had that case, there would be coverage. It's just another method of theft. The reason, Your Honor, that that isn't really on point is because our policies cover misappropriation of advertising ideas. So that's why I say, and no one is even suggesting, I don't think that His Honor was suggesting that a truck is an advertising idea. He was making the point of what could be a wrongful taking versus a legitimate contract. Exactly. But, Your Honor, the cases that interpret these policies talk about what can be a wrongful taking of an advertising idea. Wasn't Vanderbilt an advertising idea? No, Your Honor. Vandenberg was a pollution case. It was a property damage case of a lessor and a lessee. So we believe that this first element. That was a property damage case. Yes. In Vandenberg, a property was leased to a tenant who had an underground storage tank, and there was some pollution caused by leakage over the years, and they were then sued by the landlord for breach of the lease, also nuisance, et cetera. And the judgment came out for breach of the lease, and the court said there basically, well, if it's property damage, it doesn't matter if it's on a theory of breach of the lease. They just as easily could have won it on a theory of nuisance. Why isn't that highly analogous? I'm sorry, Your Honor? Why isn't that highly analogous? Why is it not? Why is it not highly analogous? It is not analogous because of what was actually tried in this case. Your Honor would have to come to the conclusion that, and the Vandenberg court says you need to look at the nature. We're not going to be hung up on labels. That's really sort of the message of Vandenberg. You look at the nature of the risk. How dangerous will courts say that? The nature of the damages. And if I can address the nature of the damages for a moment, because it is critical to this court's analysis of the case. There has to be three prongs, as we mentioned, for advertising injury coverage. So even if we're not persuading Your Honors, and Your Honors believe that there is a misappropriation of advertising ideas here, which would be contrary to all of the reported case law, that even if Your Honors find that, they still have to prove that the damages, this $2 million award, arose out of or were caused by advertising. And we do not have that at all here. Their theory of the case, and the record is complete with this, is Wanda Weave took our idea, and our idea had a value, this symphony of color, marketing scheme, and the masquerade. And the damage that was caused to the Ennens by their own expert was, what was the value of this idea? Because there were supposed to be six paintings and posters and prints and everything. This is all in the record, Your Honors, over a period of time. So whether or not Wanda Weave used that in advertising or not, the damages to the Ennens occurred the moment Wanda Weave did this quote-unquote wrongful taking. Because the record that they made themselves says, once you give your advertising idea to somebody, it wasn't like they could go sell it to another customer. The idea was spoiled. It was now affiliated with Wanda Weave. So the damages that they got, the $2 million, were for the value of the idea. That is not caused by the advertising. If Wanda Weave, once they breached the contract or once they stopped paying in January of 1994, if they had never used the symphony of color again, the same damages would have been applicable because that idea was now spoiled. Ennens could never use it again. Or likewise, if Wanda Weave was using it even today, if they were still in business and every day they were using the symphony of color, that would not create additional damages to the Ennens because they were only entitled to the value. And so there is no connection between the damages that they recovered and the advertising. So even if you assume it's a covered offense, there is this causal connection, which this court has repeatedly looked at, is just totally absent here. And the damages were not caused by the advertising, as contrasted, for example, with LaBasse, where you have a competitor who has no relationship whatsoever and uses your trade name. Well, obviously, it's going to be taking away your business. And so the damages that you suffer, a loss of business, are going to be directly related to the advertising. That is simply not here. Your Honors, I need to sit down and let my co-counsel speak. Oh, yes. Go ahead. Thank you very much. Good morning, Your Honors. Dean Herman for Twin City. And I'm going to try to avoid repeating what my co-counsel said. That was a good idea. I want to make a few points. The first is, on the question of wrongful taking, misappropriation, I think it's important in the context of what a contract is, as opposed to a tort, to consider that parties in commerce have the right, if they choose to, to breach a contract. The whole idea of a contract, and there's nothing wrongful about it. It's not a tort. It's not a bad thing. It's a business decision. And part of the contract that the parties contemplate is, what's the consequence of doing that? In this case, the judge in the underlying case, excuse me, instructed the jury on damages, and it was a benefit of the bargain instruction. This is not a wrongful act. It is not a wrong. It is not a misappropriation. It is simply a decision to stop paying, and apparently they couldn't pay anymore. They did pay for a while. They stopped paying. In fact, the ends encouraged them to, please stick with the program. We want you to do this. We want you to use the idea. We want you to advertise. They just couldn't do it. They couldn't afford it. And eventually, I think they kept giving them extensions to pay money all the way into September or October of 1994, and then the suit was filed. So there's nothing wrongful. There's no misappropriation. In terms of the one of the jury instructions, I'm having trouble reading this, but I'll cite it for the record. It's Kelly U.S. Fires' excerpts, page 90. Part of the instruction says, The distinction between an express and an implied-in-fact contract relates only to the manner in which the agreement is shown. Both types are based on the express or apparent intention of the parties. I think that's the answer to the should-have-known issue. In the implied-in-fact contract, it's the conduct of the parties. We have an objective theory of contract. So should-have-known was a misstatement of the law? No. I think the apparent intention of the parties is the standard for concluding the terms of an applied-in-fact contract, although here there were multiple writings. So I think this was a contract case in every way, shape, and form. And I'd like to just, in the context of this issue and some of the arguments made by appellants' counsel, I think you mentioned a surety bond. There are ways to protect against breach of contract. I think that underscores the fact that's not the kind of policy we have here. I think this is the kind of policy that is not designed to cover a foreseen, contemplated business decision, which can be made in a contract concept. The other thing I'd like to address is this notion of some intent from the outset, using the U-Haul analogy, to defraud. That's promissory fraud. And I think the most important point there is indemnity coverage is not a free-floating concept. We have a judgment from an underlying action that was actually tried. And it wasn't just the jury who decided issues. The court decided issues also, the district judge. And there were these 11 or however many causes of action or legal theories, and one by one they were decided. And they're decided and final now. And the only thing left that was ultimately decided against WandaWeave was breach of contract. And the damages available are benefit of the bargain. It's a pure contract case. This case particularly has facts that I think make this easier than maybe it could be. There was no wrongful taking. It is simply a contract case. And I think to accept the Ennens argument here would turn the duty to indemnify into the duty to defend. Simply a contract case, that's the end of it? I think so, Your Honor. Then you get, don't you get back to Vandenberg? I think you can get back to Vandenberg. But I think Vandenberg, I think an insurance policy is, there's a logic, I think, to going through the analysis. Vandenberg addressed the introductory language, legally obligated to pay. And in that context, Vandenberg was not prepared to say you need to have a tort. It could be something else. But as you work your way through the policy and you get to a definition, in this case, of an advertising offense, and I also want to be sensitive to my co-counsel, an advertising offense, we have a part of the policy that in order to come within, you need a misappropriation. You need a wrongful taking. And I don't believe a contractual relationship where the parties actually do have the right to breach satisfies that in any way, shape or form. Okay. Thank you. Could I just, one very quick point on public policy, 533. California public policy is to deter wrongful conduct. You can't have people come into the State, commit a willful act, and run back to their State and have insurance coverage for it. So I think if there's any doubt, that drives the choice of law issue to the extent it would ever be applicable, and California law applies on that, too. Thank you very much. Okay. Cases are used as submitted. We'll now take our recess. Thank you.
judges: B.fletcher, Kozinski, Trott